| | |
|---|---|
| **KAREN LEDDY, as guardian ad litem for her minor child E.P., et al.,** | Civ. No. 17-5245 (KM) (JBC) |
| **Plaintiffs,** | **OPINION** |
| **v.** | |
| **NORTHERN VALLEY REGIONAL HIGH SCHOOL DISTRICT, et al.,** | |
| **Defendants.** | |

**KEVIN MCNULTY, U.S.D.J.:**

**Introduction**

Before the court is a motion for a preliminary injunction, brought on by order to show cause filed by plaintiff Karen Leddy on behalf of her daughter, E.P. This parent and student seek retroactive revision of a high school's method of reporting "CPE" classes on transcripts for the 2014–15, 2015–16, and 2016–17 school years, as well as retroactive recalculation of students' grade point averages to reflect an additional half point of weight for CPE classes. The application is based on alleged discrimination in violation of Title II of the Americans with Disabilities Act ("ADA").

North Valley Regional High School ("NVRHS") offers classes in four varieties: College Prep ("CP"), College Prep Enriched ("CPE"), Honors, and Advanced Placement ("AP"). In calculating a student's grade point average ("GPA"), NVRHS weights CP and CPE courses the same, but assigns additional weight to Honors and AP courses. A student may enroll in an Honors or AP class by obtaining a faculty recommendation. Lacking such a recommendation,

she[1] may "waive" into an Honors or AP class, *if* she signs a waiver form saying that she "understands the requirements and demands of the honors/advanced placement course" and that "no accommodations or curricular adjustments will be made." (Compl. ¶¶ 35-42, Exs. M, N) NVRHS student transcripts do not specifically designate or distinguish between CP and CPE courses, although they do note enrollment in AP or Honors courses.[2]

On July 18, 2017, plaintiffs Karen Leddy and her daughter, E.P., together with Anna Danon-Reduce and her daughter, E.R., filed a complaint and application for an order to show cause. The complaint alleges that the school's policies discriminate against students, such as E.P. and E.R., who have learning disabilities. The waiver policy, they say, excludes disabled students from AP and Honors courses, while the transcript policy devalues the CPE courses that they do take. The upshot is that E.P and E.R have allegedly been placed at a competitive disadvantage relative to similarly situated non-learning-disabled students.

The issue has come to a head with respect to Leddy's daughter, E.P., who will be applying to colleges in the fall. E.P. seeks a preliminary injunction consisting of (1) a declaration that NVRHS's waiver policy discriminates in violation of Title II of the ADA; (2) an order compelling NVRHS to "correct" transcripts to reflect students' enrollment in CPE (not CP) courses; and (3) an order compelling NVRHS to retroactively add 0.5 points of additional weight to CPE course grades and recalculate students' GPAs. I set the matter down for a preliminary injunction hearing to be held on August 23, 2017.

I accepted pre-hearing affidavits from witnesses in lieu of direct testimony. (I also considered the Complaint itself, which is verified.) At the

---

[1]   The plaintiff happens to be female. Throughout, even in quotations from case law, I will use feminine pronouns when referring to a generic party or student.

[2]   NVHRS transcripts will list, for example, "English 1" or Algebra 2," regardless of whether it is a CP or CPE course. But if a student is enrolled in, say, Physics or English 2 at an AP or Honors level, the transcript will list the course as "AP Physics" or "Honors English 2."

hearing, the plaintiff introduced supplemental live testimony from Leddy and Danon-Reduce, as well as from James Santana, the superintendent of the school district. All were subjected to cross-examination. As for documentary evidence, plaintiffs largely relied on the exhibits attached to their complaint and application for emergent relief. Although the complaint cites a number of statutes, counsel for the plaintiffs represented at the hearing that the focus of the preliminary injunction application is the ADA claim of E.P.

The Court finds it easy to sympathize with parents who believe a revised system would enhance their children's college prospects. Indeed, their arguments of fairness seem to have swayed the school district, which has revised the system for 2017–18 and subsequent years. The real dispute here is whether the school district should be ordered to revise transcripts and GPAs retroactively, so as to cover the earlier school years. I stress that this Court does not possess any general authority to impose its notions of fairness on a local school district, which must set educational policy and weigh the interests of all students, including those whose legitimate expectations might be defeated by any retroactive revisions to transcripts. This plaintiff may prevail on her application only if she establishes that the existing arrangement violates federal law—specifically, the Americans with Disabilities Act.

For the reasons set forth below, the preliminary injunction is denied, primarily because Leddy and E.P. are not likely to succeed on the merits of their ADA claim. Because the issues decided here alter the context and possibly the content of NVRHS's cross-motion to dismiss, I will administratively terminate that motion without prejudice to renewal.

## I.  FACTUAL FINDINGS[3]

### A.  Parties

NVRHS is a public regional high school located in Demarest, New Jersey, which is administered and controlled by the district local Board of Education (the "Board"). Geoffrey Gordon was the interim superintendent of the school district; James Santana, the principal of NVRHS, succeeded Gordon as superintendent. Howard Tiell and Matthew Spatz are guidance counselors, and Barbara Battaglia is a director of special education, at NVRHS.[4] (Compl. ¶¶ 5-18)

E.P. is a rising senior at NVRHS, *i.e.*, she is beginning her senior year in September 2017. Since 9th grade, E.P. has had an individualized education program ("IEP") to accommodate her reading and writing disabilities.[5] She has

---

[3]    Counsel for the parties acknowledged that few pertinent facts were actually disputed. For the most part, the application requires the Court to rule on the legal consequences of the facts as alleged.

Certain citations to the record are abbreviated as follows:

"Compl." — Verified Complaint for Declaratory, Injunctive Relief, and Equitable Relief (ECF No. 1)

"Ex. __" — Exhibits attached to the Complaint (ECF no 1)

"Santana Cert." — Certification of James Santana in Support of Defendants' Opposition to Plaintiffs' Request for Injunctive Relief and in Support of Defendants' Cross-Motion to Dismiss Plaintiffs' Complaint (ECF No. 10-2)

"Seijas Cert." — Certification of Anthony P. Seijas, Esq., in Support of Defendants' Opposition to Plaintiffs' Request for Injunctive Relief and in Support of Defendants' Cross-Motion to Dismiss Plaintiffs' Complaint (ECF No. 10-1)

"Leddy Decl." — Declaration of Karen Leddy (ECF No. 20)

[4]    Plaintiffs have not moved to preliminarily restrain defendants Bergen County Board of Education and Norah Peck, and counsel agreed in conference that those defendants would not be required to attend the preliminary injunction hearing.

[5]    Under the Individuals with Disabilities Education Act (IDEA), states have an obligation to ensure that children with disabilities receive a "free appropriate public education, or "FAPE," 20 U.S.C. § 1412(a)(1), in the form of special education "provided at public expense, under public supervision and direction." 20 U.S.C. § 1401(8). Such special education will be provided "in conformity with the individualized education program [IEP] required under Section 1414(d) of this title." *Id.*

taken a number of CPE courses, as well as some AP courses.[6] An able student, E.P. has done well in all of them. She will soon begin applying to colleges. (Compl. ¶¶ 5-6)

### B. AP/Honors Waiver Policy

A faculty recommendation is one route to enrollment in an AP or Honors course. Even without a recommendation, however, a student may "waive" into an AP or Honors course no more than twice per semester so long as

(1) the student is enrolled in an honors course with a minimum cumulative grade of C+ or is enrolled in a CPE course with a minimum cumulative grade of B+; and

(2) the student and her parent sign a preprinted waiver form certifying that

> the student understands the requirements and demands of the honors/advanced placement course and is willing to enroll in the course without the recommendation of the faculty and that department. The student further understands that no accommodations or curricular adjustments will be allowed per academic year.

(Exs. M, N (ECF no. 1 at 102–09)) That recommendation/waiver policy was in effect at NVRHS for the 2014–15, 2015–16, and 2016–17 school years.[7] NVRHS supplied a copy of the waiver form to all parents. (Compl. ¶¶ 35-42 & Exs. M, N)

---

In 2017 it should not be necessary to explain that a learning disability does not imply lack of academic ability. For clarity, however, I acknowledge it explicitly. To decide this motion, it is not necessary to detail the contents of E.P.'s educational records. A summary of the courses E.P. took and grades she received is in the record, however. *See* Ex. S.

[6]    These particular AP courses did not require a recommendation or a waiver, so they do not bear directly on her claims.

[7]    The policy has been changed prospectively for the 2017–18 and subsequent school years. *See* Ex. Q. This discussion is confined to the policy in effect during the prior years.

Leddy alleges that E.P. was prevented or at least discouraged from enrolling in AP or Honors courses. Sometime in September 2015, for example, a teacher did not recommend E.P. for a 10th grade Honors English course, even though her IEP that year recommended that she take Honors English. E.P eventually received a teacher's recommendation at the request of her mother, Ms. Leddy. E.P., however, seems to be an independent young woman. Considering the recommendation to be not teacher-driven, but "'parent driven' and [therefore] not actual acceptance into the Honors course," E.P. opted to enroll in the CPE version of English for the 2015–16 school year. (Compl. ¶ 57)

Two years later, during a February 14, 2017 meeting with Spatz, Tiell, and a third guidance counselor, O'Malley, Leddy re-raised the Honors English issue. She asked why E.P.'s teacher had not recommended her for AP or Honors English courses despite her success in CPE English. Tiell responded that E.P. could waive into Honors English if she wished, but that Tiell "could not guarantee her success." Ms. Leddy responded that she would not sign a waiver forfeiting E.P.'s IEP rights. (Compl. ¶ 65f)

The following week, in a February 20, 2017 meeting with Tiell and E.P.'s English teachers, the school relented. E.P.'s teacher, Ms. Januzzi, apologized and "explained that she did not mean to suggest that E.P. was not qualified for Honors, but rather she was acting in response to an English Department directive to limit the number of Honors recommendations." The teacher changed her recommendation to English 4 Honors. (Compl. ¶ 65g)

Sometime in February 2017, after students had picked their classes for the spring semester, NVRHS removed the "no accommodations or curricular adjustments" language from the waiver policy.[8] (Compl. ¶¶ 50-51; Ex. Q) In the

---

[8]    The relevant passage (Ex. Q) now reads as follows:

Signature acknowledges the requirements and demands of the honor/advanced placement course and willingness to enroll in the course without recommendation of the faculty. A maximum of two waivers for honors/advanced placement courses will be allowed.

2017–18 school year and in subsequent years, then, the recommendation/waiver policy will no longer apply in the form quoted above.

## C.    Transcript/Grade Weighting Policy

NVRHS historically had five course designations: Replacement/General, Scholastic, College Prep, Honors, and Advanced Placement. Starting in the 2014–15 school year (*i.e.*, E.P.'s freshman year), NVRHS re-named two of them: Scholastic became College Prep ("CP"), and College Prep became College Prep Enriched ("CPE"). The change, Santana testified, was essentially cosmetic: A number of students in "Scholastic" classes were going to college, and parents felt that the name was stigmatizing. Following past practice, however, the CP and CPE courses would continue to be treated as equivalents: Transcripts would not distinguish between CP and CPE classes, and grades for either would receive the same weight. (Santana Cert. ¶¶ 21-23, 27)

The basis for the CP/CPE distinction is disputed to some degree. According to Leddy and Danon-Reduce, CPE courses are more rigorous than CP courses.

Santana testified that the main differences relate to availability of classroom support, pace, and depth.[9] CP courses, for example, sometimes have two teachers, as opposed to CPE's one. CPE courses, on the other hand, are better suited for independent learners. From NVRHS's perspective, these differences are minor and do not justify weighting CPE courses more than CP courses in calculating students' GPAs. (*Id.* ¶¶ 29-33) The school has never given additional weight to CPE courses (or their equivalent predecessors) over CP courses (or their equivalent predecessors) at any point during Santana's 21 years at NVRHS.

E.P. enrolled in a number of CPE courses in each of the 2014–15, 2015–16, and 2016–17 school years. E.P.'s transcript—like those of every other

---

[9]    Indeed, Santana generally conceded that the differences among all levels of courses—not just CP and CPE—relate to pace, depth, intensity, and method of instruction.

NVRHS student—does not designate or distinguish between CP and CPE courses. E.P.'s GPA—like those of every other NVRHS student—did not receive additional weight for CPE courses.

Leddy testified that she could not recall seeing E.P.'s transcripts (Ex. I),[10] and did not become aware of the CPE grade-weighting issue until sometime in January 2017. During an IEP meeting that month, Tiell told Leddy and E.P. that E.P.'s transcripts "lacked academic rigor" for purposes of applying to some of E.P.'s targeted colleges. On January 20, 2017, Leddy reported Tiell's comment in an email to Gordon, the interim superintendent, and asked, "Why is the word 'Enriched' kept off the transcript?" Gordon responded that NVRHS was "looking at weighting CPE classes to differentiate the rigor from CP." (Compl. ¶¶ 63, Ex. U)

For the next six months, Leddy and Danon-Reduce attempted to cajole NVRHS administrators and the Board into doing just that. School administrators expressed sympathy for their goals. Thus, on February 9, 2017, Gordon allegedly told Danon-Reduce: "It's not right. . . . It has to be changed. The transcripts have to name CPE just as they name Honors or AP and those kids should receive added GPA of .5." A few days after that, on February 14, 2017, Santana allegedly told Danon-Reduce "I told 'them' this was going to become an issue. The levels are different and need to be identified on transcripts." In February 16, 2017 email, Santana told Leddy that NVRHS was trying to figure out "whether or not we can go back 2 years."[11] (Compl. ¶¶ 65a, 65b, 65h)

---

[10]    By that, Ms. Leddy seems to mean that she did not view the official transcript. At the hearing, all acknowledged that students' grades are periodically reported *via* report cards or the electronic equivalent.

[11]    Around this time, Leddy rejected two offers from Spatz to write a letter to colleges explaining which of E.P.'s courses were CPE-level. Spatz himself allegedly acknowledged that such a letter would not be read by large state universities. (Compl. ¶¶ 65b, 65e)

By early spring, however, progress seemed to stall. Concerned that E.P. "would be applying to colleges with an inaccurate academic transcript," on March 20, 2017, Leddy asked NVRHS to provide "corrected" and "accurate" transcripts. The issue, as Leddy saw it, was that E.P. would need to self-report her grades to colleges. If E.P. reported taking CPE courses not identified as such in her official transcript, colleges could reject her applications as untruthful. (Compl. ¶¶ 65i, Ex. X)[12]

A month later, on April 20, 2017, Gordon told Leddy that "the CP/CPE issue is in the hands of the Board Attorney at this time." He continued:

> The problem is both sides of the issues have merit.
> First, under Federal and State law no district is
> permitted to discriminate against students with special
> needs so part of the resolution of this issue has to
> ensure that [NVRHS] is of the highest standards of
> fairness to students with learning differences. On the
> other side of this issue is the point that you make
> which is currently there is no differentiation between
> CP and CPE.

(Compl. ¶¶ 65j)

In a May 10, 2017 email to Leddy, Gordon reiterated his view of the issues:

> Pls note that there are two conflicting issues. One is
> exactly as you state, that the students taking the more
> difficult course need to receive credit for their work. . .
> . On the other side of the coin, Federal and State IDEA
> law do not permit discrimination of protected classes
> of special needs students. So it is a very complicated
> issue.

---

[12]    Throughout the process, plaintiffs have stated that existing transcripts are not "truthful" or "accurate," and have stated that the relief requested is "correction" of the transcripts. Although I understand what plaintiffs mean, such terminology is hyperbolic. The transcripts are not "inaccurate" in the usual sense of the word; they accurately report information in conformity with then-current policy. What plaintiffs seek is a retroactive *change* in the policy of how courses are reported and grades are weighted. Of course, no college applicant should self-report her grades in a manner that creates a discrepancy with her transcript.

Nevertheless, he wrote in the same email, "we are proposing that students get credit for what they take similar to Honors, AP, etc." (*Id.* ¶ 65k & Ex. Y)

Five days later, on May 15, 2017, Danon-Reduce threatened to file a complaint with the New Jersey Department of Education unless Gordon met with her and Leddy about the transcript/weight issue. On May 18, 2017, Gordon sent Peck, the interim executive for the Bergen County BOE, a letter seeking guidance about whether NVRHS should (1) keep the same transcript policy; (2) designate CPE courses with "(E)" for the 2016–17 year, but begin the process of eliminating CP courses entirely; or (3) retroactively designate all CPE courses with "(E)." Gordon did not present retroactive weighting of CPE grades as an option. (Compl. ¶¶ 65n, 65aa, Ex. HH)

Also on May 18, 2017, Leddy and Danon-Reduce met with Gordon, Santana, and other school officials. Gordon allegedly told Danon-Reduce and Leddy that the Board's lawyers had agreed to identify CPE and CP courses on transcripts prospectively, but permission from the Department of Education was needed to make retroactive changes. He also told them that he had sent a letter to Peck, the Interim Executive of the Bergen County Board of Education, requesting approval for retroactive changes to CPE designations and GPA weight. (Compl. ¶ 65p)

The day after the meeting, on May 19, 2017, Gordon emailed Leddy and Danon-Reduce that he was meeting with Peck and that he would "follow up with Matt Spatz about notations of enriched on the transcript for this year's and next year's courses." He also mentioned that he would be looking into "students earning their way into honors without the need of a teacher's recommendation or waiver." "The one unknown," he cautioned, "is what the state's ruling will be." (*Id.* ¶ 65s)

On May 22, 2017, Leddy and Danon-Reduce told Gordon that parents had "expressed concern about the late date and their unwillingness to accept as complete and accurate any transcript that is not retroactive to 2014–15."

"No one," they wrote, "can rationalize why the increased rigor of Honors and AP is recognized and that of CPE is not." Gordon replied, "This is all at the NJDOE including all of the options like transcript notations, weighing, etc," and he "gave them a deadline of May 31 so hopefully they will do so." (Ex. FF)

On May 25, 2017, Gordon sent Leddy and Danon-Reduce another email. He reiterated that "I did put weighting as an option into the DOE package and discussion so hopefully they will give us a ruling on that as well." (ECF No. 24-1)

The May 31st "deadline" came and went. On June 8, 2017, Leddy emailed Assistant DOE Commissioner Robert Bumpus and asked the DOE to "provide us an answer as to whether or not the decision regarding retroactivity, and thus truthful transcripts, is yours to be made and if not, whose decision it is." A few days later, Bumpus informed Leddy that the transcript issue "was a local matter and the matter had been referred back" to NVRHS. (Compl. ¶¶ 65cc–ee)

"Great news!" Leddy and Danon-Reduce wrote in a June 13, 2017 email to Gordon, Santana, and other officials. "We have received confirmation from the DOE that transcript corrections are a 'local issue' and therefore the district does not require permission to make retroactive corrections to ensure that students['] transcripts are complete and accurate." They demanded that NVRHS (1) retroactively differentiate CPE and CP coursework; (2) retroactively weight CPE coursework with an extra 0.5 points; and (3) allow students to access all levels of instruction regardless of any accommodations that would be required. (Ex. LL)

On June 15, 2017, Leddy and Danon-Reduce sent another email to Gordon and Santana. "[Y]esterday afternoon," they said, "our attorney informed us that the district's attorney had reach out to advise her that the transcripts issue has been resolved . . . . We are thrilled to hear that transcripts will final be accurate and complete via retroactivity." However, a week later, on June 22,

2017, Gordon sent a letter to all NVRHS parents informing them "all classes with enriched designation will be noted on transcripts with an (E) symbol" for the "2016–17 school and going forward," but not for the 2014–15 and 2015–16 school years. Gordon's letter did not mention retroactively re-calculating GPAs to give CPE courses additional weight. Rather, Gordon noted that NVRHS "will evaluate this change and determine if further adjustments to our program and/or transcript designations are required" for the 2017–18 school year. (Compl. ¶¶ 65hh–jj)

About a month later, on July 20, 2017, a lawyer representing a group of parents of students in CP classes sent NVRHS a letter. These parents claimed that the new policy discriminated against *their* children—many of whom are themselves special education students—in violation of Title II of the ADA. They enrolled their children in CP classes on the understanding that the curriculum would be the same as the CPE curriculum, differing only as to the presence of a special education teacher: "Parents were specifically told that there was *no difference* between classes other than there being an extra teacher in the CP classes," the letter claimed. "[S]tudents relied on the representations made to them about CP and CPE classes not being differentiated on their transcripts or in educational value . . . ." Thus to adopt the new policy retroactively would stigmatize and disadvantage students who selected CP classes in good faith to take advantage of an "accommodation"—*i.e.,* the presence of a special education teacher. The only fair way to enact this policy change, these parents argued, was "to roll out the new program with notice and information about the curriculum . . . to 8th grade students and their parents so that they can make informed educational decision." The letter demanded that the new policy, or at least its retroactive component, be rescinded. Litigation was threatened ("other avenues to protect the legal rights of their children"). (Seijas Cert., Ex. A, ECF no. 11-2)

As result of that letter, NVRSH decided to designate CP/CPE courses in transcripts only prospectively, *i.e.,* from 2017–18 forward. (Santana Cert. ¶ 35)

## II.    DISCUSSION

### A.    Preliminary Injunction Standard

"A plaintiff seeking a preliminary injunction must establish (1) that she is likely to succeed on the merits, (2) that she is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in her favor, and (4) that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (numbering added); *accord American Express Travel Related Servs., Inc. v. Sidamon-Eristoff*, 669 F.3d 359, 366 (3d Cir. 2012). Because a preliminary injunction is "an extraordinary and drastic remedy," the plaintiff must establish each element by a "clear showing." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (quoting 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2948, pp. 129–130 (2d ed. 1995)). Even then, a trial court's decision to issue a preliminary injunction is "an act of equitable discretion." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)

A Court will consider all four factors, but the first two are essential. *See Adams v. Freedom Forge Corp.*, 204 F. 3d 475, 484 (3d Cir. 2000); *accord Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186, 197 (3d Cir. 1990) (placing particular weight on the probability of irreparable harm and the likelihood of success on the merits, stating: "[W]e cannot sustain a preliminary injunction ordered by the district court where either or both of these prerequisites are absent.") (quoting *In re Arthur Treacher's Franchisee Litigation*, 689 F.2d 1137, 1143 (3d Cir. 1982)); *Morton v. Beyer*, 822 F.2d 364, 367 (3d Cir. 1987); *Freixenet, S.A. v. Admiral Wine ds Liquor Co.*, 731 F.2d 148, 151 (3d Cir. 1984); *American Express*, 669 F.3d at 366, 374. *But see Conestoga Wood Specialties Corp. v. Secretary of U.S. Dept. of Health and Human Services*, 724 F.3d 377 (3d Cir. 2013) (debating whether there is a "sliding scale" of the four factors).

## B. Analysis

### 1. Likelihood of Success on the Merits

Counsel for Leddy and E.P. represented at the August 24, 2017 hearing that the focus of this application for a preliminary injunction is E.P.'s claim of discrimination under the ADA. I thus analyze the first element of the preliminary injunction standard—the likelihood of success on the merits—in relation to the ADA claim.[13]

A Title II plaintiff must demonstrate that "(1) she is a qualified individual; (2) with a disability; (3) she was excluded from participation in or denied the benefits of the services, programs, or activities of a public entity, or was subjected to discrimination by any such entity; (4) by reason of her disability." *Bowers v. Nat'l Collegiate Athletic Ass'n*, 118 F. Supp. 2d 494, 511 (D.N.J. 2000), *opinion amended on reargument*, 130 F. Supp. 2d 610 (D.N.J. 2001); *accord Bowers v. Nat'l Collegiate Athletic Ass'n*, 475 F.3d 524, 553 (3d Cir. 2007), *amended on reh'g* (Mar. 8, 2007); *see also CG v Pennsylvania Dept. of Educ.*, 734 F.3d 229, 234 (3d Cir. 2013). To satisfy the fourth ("by reason of") prong, "a plaintiff must establish a causal connection between his or her disability and the alleged discrimination." *Id.* at 511–12; *see also CG*, 734 F.3d at 236 ("Plaintiffs must show that they have been deprived of a benefit or opportunity provided to non-disabled students or a group of students with some other category of disability, because of their disability.")[14]

---

[13]    The complaint alleges violations of section 504 of the Rehabilitation Act, the New Jersey Law Against Discrimination, section 1983 (violations of equal protection, due process, and federal student record rights), conspiracy to interfere with civil rights in violation of section 1985(3), and breach of contract.

[14]    The same legal principles generally apply to Rehabilitation Act claims, which plaintiffs also assert against the governmental defendants (although not on this preliminary injunction application). *See CG*, 734 F.3d at 235-37 (observing that the elements of RA and ADA claims are the generally same, although the causation standards differ). "[T]he remedies for violations of § 202 of the ADA and § 504 of the Rehabilitation Act are coextensive with the remedies available in a private cause of action under Title VI of the Civil Rights Act of 1964." *S.H. ex rel. Durrell v. Lower Merion Sch. Dist.*, 729 F.3d 248, 260–61 (3d Cir. 2013) (quoting *Barnes v. Gorman*, 536

There is no dispute that E.P. is (1) a qualified individual (2) with a learning disability. As to elements (3) and (4), however, I am not convinced. I do not see any sufficient indication that she will succeed on her claim that NVRHS excluded E.P. from enrolling in AP or Honors courses, or denied her the benefit of a CPE-designated transcript with higher-weighted grades because of her disability.

### a. Waiver of disability accommodations

The first claim is that by signing the waiver form, E.P. would have relinquished her statutory right to accommodation of her disability—in particular, the accommodations contained in her IEP. Thus, she claims, her admission to AP or Honors courses was impermissibly conditioned on her waiving her rights as a disabled person, in violation of the ADA.

The first problem with this claim is that Leddy and E.P. were not required to, and did not, sign the waiver, because the teachers ultimately agreed to furnish the necessary recommendations. E.P. never actually waived into any relevant Honors or AP course, and so she never actually was in the position of relinquishing any accommodation to which she was legally entitled. That is not all there is to her claim, however. The theory of the complaint is that it was the *requirement* that she sign a waiver of accommodations that *prevented* E.P and her mother from enrolling her in Honors or AP courses. Viewed as an allegation, that is not wholly implausible. Undercutting it factually, however, are the circumstances surrounding the only two decisions described in detail, both in relation to Honors English.

---

U.S. 181, 185 (2002)). Those remedies include declaratory and injunctive relief, and, in certain circumstances, money damages. *See, e.g., Guardians Ass'n v. Civil Service Com'n of City of New York*, 463, U.S. 582 (1983); *S.H.*, 729 F.3d at 262 ("We . . . hold that claims for compensatory damages under § 504 of the RA and § 202 of the ADA . . . require a finding of intentional discrimination.").

The waiver issue allegedly came up in September 2015, but the teacher quickly backtracked and agreed to give E.P. a recommendation. (*See* p. 6, *supra*.) To be sure, the teacher might not have agreed to furnish the recommendation without Leddy's prodding, but agree she did. E.P. could thus have enrolled in Honors English without signing the waiver at all. As it happened, E.P. decided on her own that she would not enroll. There is no allegation, let alone proof, that NVRHS would have refused to honor the requirements of the IEP if E.P. had enrolled in Honors English based on the teacher's recommendation.[15] If the claim is just that the teacher's initial attitude was disheartening or discouraging, I find that to be too weak a basis for injunctive relief.

A second waiver-related incident occurred in February 2017, when the dispute underlying this litigation was already brewing. The complaint alleges that during a February 14, 2017 meeting, Leddy objected to a teacher's failure to give E.P. a recommendation for Honors English. Leddy alleges that she declined to sign the waiver form because the "no accommodations" language would have forfeited EP's rights under her IEP. (Compl. ¶ 65f) Leddy's description of that February 2017 encounter constitutes the earliest indication that she (or anyone) interpreted the waiver form in this manner. I accept *arguendo* that Leddy's reason for rejecting the 2017 waiver was its inclusion of the "accommodations" language. The fact remains that Leddy and E.P. were never actually called upon to sign the waiver as a condition of enrollment, because the teacher gave in to Leddy's insistence that E.P. be given a recommendation. Mere days later, the teacher relented and recommended E.P. for the Honors English course. (*See* p. 6, *supra*; Compl. ¶ 65g)[16]

---

[15]    There is no indication, by the way, that in 2015 Leddy objected to the waiver on the basis of its containing the "no accommodations" language; her complaint was simply that E.P. deserved the recommendation.

[16]    Plaintiff E.R.'s comparable experience tends to undermine the allegations here as well. E.R.'s middle school recommended her for Honors History, a course in which she performed admirably in her freshman year. E.R. was not recommended for Honors

There is a second factual weakness in this waiver claim: There is no substantial evidence that anyone really interpreted the language of the waiver form as requiring students to sacrifice lawful IEP accommodations. Here is the language of the form: "By signing this waiver form," it reads, "the student understands the requirements and demands of honors/advanced courses and is willing to enroll in the course without the recommendation of the faculty . . . . The student further understands that no accommodations or curriculum adjustments will be made . . . ."

Plaintiff reads "accommodations" as a term of art—*i.e.,* the word as it is used in anti-discrimination law. As she interprets this language, the school is saying that a blind student who signed the waiver would be barred from bringing a guide dog into the Honors classroom. At oral argument, plaintiffs' counsel gave a less drastic, perhaps more realistic example: A dyslexic student who waived into Honors Chemistry, he said, would be waiving her right to aural assistance in processing the graphically-presented information in the Periodic Table of Elements. In short, by signing this waiver, says plaintiff, a student would be checking her IEP, to which she is statutorily entitled, at the classroom door.

The waiver form need not be read that way, however, and there are strong indications that it was neither intended nor actually read in that manner.[17] Accommodations" is an ordinary English word, not confined to the

History the following year, however. She initially intended to waive into the class, but decided against it after the history department told her it was likely that "her grades would suffer." E.R. in other words, chose not to take Honors History because she "wasn't recommended, they must think I can't do it"—not because she was required to forfeit her IEP accommodation in her freshman Honors class (she wasn't), or anticipated that she would have to sacrifice it if she enrolled in the sophomore class. (Compl. ¶¶ 58-62)

[17]     The waiver/recommendation system is self-evidently a compromise between the warring goals of individualized and generalized instruction. To rigidly "track" students may have some pedagogical benefits; on the other hand, students who are pre-sorted based on the perceptions of the faculty and administration, without student or parent input, may be denied their full potential. NVRHS straddled: it created Honors and AP classes, accessible through teacher recommendations, but also permitted parents and

context of anti-discrimination law. This waiver form was sent to all parents, not only to parents of learning-disabled students with IEPs. Viewed in context, the waiver does not single out learning-disabled students for disparate treatment. Its plain-language thrust is clear: it warns all parents and students that NVRHS will permit students to enroll in AP or Honors courses against the better judgment of the faculty, but cannot guarantee that they will succeed. If the student does not do well, the waiver form warns, NVRHS will not respond by softening the academic rigor of the course. From this context I conclude that NVRHS meant "accommodations" not in a technical, but in a plain-English sense; that is, it intended to inform parents that the "demands" or "requirements" of AP or Honors courses would not be changed or adjusted just because a student struggled in an intentionally difficult class.[18]

Now of course "accommodation" does carry a special and technical meaning for the parents of learning-disabled children, if not the public generally. I do not consider the plaintiffs' interpretation to be the right one, but I do understand it. Anyone concerned that the waiver form required sacrifice of IEP accommodations, however, could have cleared up the situation easily. Indeed, parents who wish to waive a student into an Honors or AP course *must* attend a faculty meeting to discuss their concerns. (Exs. M, N, O)

The clincher is that, as counsel conceded at the evidentiary hearing, there is no evidence that NVRHS ever *actually* denied any student in an Honors or AP course any accommodation to which she was entitled by her IEP. Santana, who would have reason to know, testified that there had never been such a denial. Leddy and E.P., who have the burden here, have failed to proffer

---

students to waive in, after an in-person consultation with the faculty, if they believe the student is capable of the work. That—and not disability discrimination—is the evident rationale for the recommendation/waiver scheme.

[18]     Counsel for the defendants conceded that the drafter of the waiver form could have chosen better wording that would not have been susceptible to misunderstanding when read by those versed in anti-discrimination law. That, however, is not the issue.

a single instance of the waiver policy's having actually operated in the manner alleged.[19]

To sum up:

(1) I find that the waiver requirement did not exclude E.P. from AP or Honors courses at all, and *a fortiori* did not exclude her on the basis of her disability. Because E.P. herself was not required to sign the waiver but received teacher recommendations when she sought to enroll in an Honors course, the precise interpretation of the waiver form is not critical.

(2) In any event, however, the waiver form, which NVRHS sent to all parents, need not be and should not be interpreted in the manner suggested by plaintiffs.

(3) Plaintiffs have offered no evidence that the waiver operated in the manner they suggest, *i.e.,* that any student in an AP or Honors course was ever required to waive the accommodations contained in her IEP.

As to the waiver issue, then, E.P.'s ADA claim is not likely to succeed on the merits.

### b. The CP/CPE transcript issue

I turn to the likelihood that E.P. will succeed on her claim that she was wrongfully denied the benefit of CPE-specific transcript designations and additional GPA weight for CPE courses. These allegations—although they seem to be the real source of her grievance—require less discussion.

E.P. was not discriminatorily "denied access to a 5.0 GPA scale" unless she was discriminatorily denied access to Honors and AP courses. That is the issue discussed and rejected in the preceding section.

---

[19]     The first indication that Leddy herself was even conscious of the "no accommodations" language relates to course selection for the Spring of 2017, and the language was changed as of the Fall of 2017. For this reason, too, it seems unlikely that the presence of that language in the waiver form was the actual reason for any earlier decision not to enroll E.P. in Honors or AP classes.

What is different about this CP/CPE claim is the contention that NVRHS discriminated against E.P. based on her disability when it declined (a) to identify CPE courses on transcripts or (b) to give them an additional half point of weight in the calculation of students' GPAs. I conclude, however, that no case of disability discrimination has been made, or is likely to be made, from these allegations.

*No* NVRHS student's transcript bears a CPE-specific designation for the 2014–15, 2015–16, or 2016–17 school year. *No* NVRHS student has ever received additional GPA weight for a CPE course. E.P., in other words, stands in the shoes of every other NVRHS student who has taken a CPE course. Because E.P. has not been denied any benefit available to others, let alone denied a benefit on the basis of disability, I find that the ADA discrimination claim as to the transcript and GPA policies is not likely to succeed on the merits.[20]

### 2. Irreparable Harm

The second element of the preliminary injunction analysis is irreparable harm. I find that this factor is potentially present, if to some degree speculative.

---

[20]    Contrast the allegations here with those in *Hornstine v. Twp. of Moorestown*, 263 F. Supp. 887 (D.N.J. 2003). (At oral argument, plaintiffs' counsel identified *Hornstine* as his best authority.) In that case, parents learned that the plaintiff, a physically disabled student, would be named valedictorian. Succumbing to "parental and community pressure," the school district attempted to change its policy and name a co-valedictorian as well. The school district did not "disguise the fact that the proposed policy amendment to award multiple valedictorians" was directed at plaintiff. Indeed, the superintendent as much as acknowledged that the policy change was motivated by hostility to the plaintiff's disability status; naming him as valedictorian, the superintendent said, would be unfair "because other students 'were not afforded the accommodations which [p]laintiff enjoyed." *Id.* at 894-95. The Court had no difficulty concluding that "more than sufficient evidence exists to establish that the Board's proposed action was intended and designed to have particular exclusionary effect on plaintiff because of her disabled status." *Id.* at 905. That kind of evidence of targeting and discriminatory intent is absent from this case.

Going forward, irreparable harm is not an issue. E.P. is a senior, and any future infliction of harm has been addressed by the change of waiver and course-designation policy for 2017–18 and thereafter. (*See* Ex. Q.)

The claim of Leddy and E.P., however, goes deeper. They assert that the school's past discriminatory policies will cause ongoing harm, not compensable in damages, that should be addressed by a court sitting in equity.[21] That alleged harm is the impairment of E.P.'s prospects in the competitive race for admission to college. (*See* Compl. ¶ 70.) If that loss resulted from a violation of federal anti-discrimination law, it might be considered irreparable. Certainly, a damages remedy would be a very awkward substitute. *See generally Adams v. Freedom Forge Corp.,* 204 F.3d 475, 484–85 (3d Cir.2000) ("The irreparable harm requirement is met if a plaintiff demonstrates a significant risk that he or she will experience harm that cannot adequately be compensated after the fact by monetary damages.")

Nevertheless, the claim of irreparable harm is weakened to the extent that it is speculative and contingent. *Id.* at 488 ("[W]e have also insisted that

---

[21] I do not, for present purposes, rely on the defendants' more general argument that retroactive relief is impermissible. It is true of course that NVHRS has changed the waiver policy starting with the 2017-2018 school year. The retroactivity case law that defendants cite, however, addresses the retroactive application of *new law*, not the issue of whether ADA or Title II allows a court to issue an injunction with retrospective effect. *See, e.g., Bohus v. Restaurant.com, Inc.,* 784 F.3d 918 (3d Cir. 2015).

Generally speaking, in a proper case, "federal courts may use any available remedy to make good the wrong done," *Barnes,* 536 U.S. at 189 (quoting *Bell v. Hood,* 327 U.S. 678, 684 (1946)). The court's equitable powers are broad, and an injunction does not become impermissibly "retroactive" merely because it addresses a past harm. *E.g., Milliken v. Bradley,* 433 U.S. 267 (1977) (upholding district court injunction compelling state to share the costs of a mandated desegregation program that included remedial programs intended to "help dissipate the continuing effects of past misconduct").

That said, it is true that plaintiffs fail to cite any case in which a court ordered the unusual relief sought here. That remedial issue, however, need not be resolved now. The viability of the plaintiff's cause of action is logically prior to the question of what remedy, if any, she may be entitled to receive. For the present, I have found that Leddy and E.P. are not likely to succeed on their ADA claim.

the risk of irreparable harm must not be speculative."). This Court does not subscribe to the invidious and simplistic view that there is a hierarchy of colleges, arranged in a line from better to worse. Nevertheless, it seems reasonable that a somewhat higher GPA and specific course designations could help E.P.'s chances of getting into her preferred institution. (*See* Leddy Decl., ECF no. 20) Of course, many factors influence college admissions, and it is impossible to quantify the extent of any such benefit. To that extent, the harm is speculative, which would give the Court pause when considering any intrusive or drastic remedy.

As I have indicated, however, the real difficulty lies in the premise: the true question is whether E.P. has suffered a discriminatory harm in violation of federal law, not whether any such harm, if established, would be irreparable. As to that question, I have already ruled that she is unlikely to prevail.

### 3. Balance of Equities/Public Interest

The failure to show either likelihood of success on the merits or irreparable harm, standing alone, is sufficient to repel plaintiff's motion. I nevertheless address briefly the third and fourth prongs: the balance of equities and the public interest. Because the defendant is a public school system, those factors are interrelated, and I discuss them together. I do so primarily to provide a fuller picture of the considerations raised by the requested retroactive relief.

NVRHS plausibly argues that the requested injunction would put it in an impossible position in relation to its many constituents. If it is forced, for example, to retroactively redesignate courses and recalculate GPAs, it will likely be sued by parents of students in CP classes. That is not mere speculation; hearing of the district's response to the demands of Leddy *et al.*, parents of students who took CP classes hired a lawyer. That lawyer sent a lengthy letter demanding that NVRHS rescind its plan and threatening legal action. (Seijas Cert. Ex. A; *see* p. 12, *supra*) The reasons are obvious: Those students—many

of them special education students—signed up for CP courses with the valid expectation that they would be weighted equally with CPE courses. Now, too late, those CP students are being told that the status of their classes will be downgraded. They raise the specter of disability discrimination, in part because they selected those CP classes to take advantage of an "accommodation": the presence of an additional special education teacher in the CP classroom. That, of course, is a kind of ironic mirror-image of the claim made in this action.

Even setting aside competing claims of disability discrimination, the suggested retroactive relief carries the potential for havoc and unfairness. If GPAs are retroactively recalculated in the manner demanded by plaintiffs here, CP students will effectively be demoted in class rank vis-à-vis the CPE students.[22] The legitimate, vested expectations of those CP students, and not just the demands of the plaintiffs here, must weigh in the administrators' decision-making. More broadly, how a public school decides to designate its courses weigh grades is a matter of curricular design and administration best left to the discretion of local school authorities and professional educators.[23]

That discretion stops, of course, at the point where it would violate federal law. Even so, a court considering equitable remedies must tread lightly; "judicial interposition in the operation of the public school system . . . raises problems requiring care and restraint." *Epperson v. States of Ark.*, 393 U.S. 97, 104 (1968). These transcript and GPA-weighting issues will affect not only E.P., but NVRHS students past, current, and future. For now, there is no sufficient

---

[22]    Indeed, even students already in college may find that their class ranks (on which those colleges based their admissions decisions) have been retroactively reduced. I use "class rank," by the way, as a convenient shorthand for one student's standing vis-à-vis another with respect to GPA. The school district's actual assignment of class rank, or not, is not at issue.

[23]    Consider, for example, the specific demand that CPE courses be weighted by half a point. The only basis for the .5 figure seems to be that it is more than 0 (which is unacceptable to plaintiffs) but less than 1 (too drastic a demand, because it would reward CPE students just as if they had taken Honors or AP courses). There is no basis in federal law for me to make an educational judgment that a 0.5 GPA weight for CPE classes is too little, too much, just right, or not warranted at all.

justification in federal law to inject this federal court into a matter of intense local concern and debate.

Those prudential concerns, although they might not carry the day in a case with a stronger likelihood of success, confirm me in my decision that, in this case, I should not interfere with the normal decision-making process of NVRHS and the Board.

## III.    CONCLUSION

For the reasons set forth above, plaintiff's application for preliminary restrains is DENIED. Defendants' cross-motion to dismiss is ADMINISTRATIVELY TERMINATED without prejudice to renewal and reformulation in light of the issues decided here. Because this matter has already jumped ahead to the fact-finding stage, defendants may wish to consider answering the complaint and reserving their contentions for a later summary judgment motion, with the benefit of a factual record.

Dated: September 6, 2017

**KEVIN MCNULTY**
**United States District Judge**